**UNITED STATES of America,
Plaintiff,**

v.

**Akeil GREIG and Richard
Hodge, Defendants.**

**No. CRIM.1999–134.**

District Court, Virgin Islands,
D. St. Thomas and St. John.

April 20, 2001.

See also 133 F.Supp.2d 697.

Kim Chisolm, Assistant United States Attorney, St. Thomas, VI, for the plaintiff.

Claudette V. Ferron, St. Thomas, VI, for defendant Richard Hodge.

James M. Derr, St. Thomas, VI, for defendant Akeil Greig.

## MEMORANDUM OPINION

MOORE, District Judge.

On June 7, 2000, a District Court jury found Akeil Greig ["Greig"] and Richard Hodge ["Hodge"] guilty of knowingly using, carrying, and discharging a firearm in the course of crimes relating to drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); conspiracy to possess with intent to distribute a controlled substance analogue in violation of 21 U.S.C. § 846; and possession with intent to distribute a controlled substance analogue in violation of 21 U.S.C. §§ 802(32)(A)(iii), 813, and 841(a)(1) and (2). Both defendants have moved for judgment of acquittal pursuant to FED. R. CRIM. P. 29 and for a new trial pursuant to FED. R. CRIM. P. 33.[1]

## I. MOTION FOR JUDGMENT OF ACQUITTAL

In support of their motions for acquittal, the defendants advance two arguments: (1) that a substance sold as crack cocaine but consisting in fact of a mixture of wax and flour is not a "controlled substance analogue" as that term is defined in 21 U.S.C. § 802(32)(A), and (2) that there was insufficient evidence to support their convictions. For the reasons stated below, the Court will deny the defendants' renewed motions for judgments of acquittal.

The government proceeded under section 802(32)(A)(iii), charging that the de-

---

1. Defendant Hodge joined defendant Greig's motion for a new trial based on juror misconduct. The Court has already denied that mo-

tion, (see Mem. Op., Feb. 28, 2001), and addresses here only those remaining grounds alleged by the defendants.

fendants represented to an undercover agent that the substance they were selling him, which consisted of wax and flour, was crack cocaine. According to the government, the defendants thus represented to the agent that the substance would have a stimulant effect on the central nervous system substantially similar to the stimulant effect of a controlled substance in schedule I or II.

At the close of the government's case, the defendants argued that the statute required the government to prove *both* subsection (i) *and* either subsection (ii) or (iii) of the statute defining a controlled substance analogue. Under this theory, the defendants moved for judgment of acquittal because the government failed to prove the first requisite of a controlled substance analogue, namely, that the combination of wax and flour had a chemical structure similar to a controlled substance in schedule I or II.

The Court denied the defendants' motion, reading the statute as providing three alternative, disjunctive definitions of a controlled substance analogue. Accordingly, the prosecution proceeded under clause (iii) without offering any proof satisfying the clause (i) definition of a substance with a chemical structure similar to a controlled substance in schedule I or II. After the defendants were convicted of possession with intent to distribute a controlled substance analogue, they each renewed their motions for judgment of acquittal, asserting that "as a matter of law, a mixture of common flour and wax is not a controlled substance analogue as that term is defined in 21 U.S.C. § 802(32)(A)." (Def. Greig's Mot. J. Acquittal at 1; *see also* Def. Hodge's Renewed Mot. J. Acquittal at 8.) The Court holds that section 802(32)(A) provides three alternative definitions of a controlled substance analogue in three sep-

arate clauses. The renewed motions for judgments of acquittal will be denied.

In revisiting my earlier ruling, I state at the outset the applicable rules for statutory construction. The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." *Smith v. Magras,* 124 F.3d 457, 462 (3d Cir.1997) (internal quotation omitted). If the language of the statute has a plain and unambiguous meaning, the inquiry ends. "[Where] the language of the statute is clear and without ambiguity[,] ... there is no need to review the ... legislative history." *HOVIC v. Richardson,* 32 V.I. 336, 344, 894 F.Supp. 211, 216 (D.V.I.1995). The plain language of the statute is presumed to express congressional intent, and will control a court's interpretation.

> As in all cases involving statutory construction, our starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used. Thus absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.

*American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (construing provision of Civil Rights Act of 1964) (citations and internal quotations omitted). In upholding a plain reading of the statute, the Supreme Court rejected an administrative interpretation of the statutory language, observing that "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *See id.* at 71, 102 S.Ct. 1534.

## A. Controlled Substance Analogue

Section 813 provides that a controlled substance analogue, as defined in section

802(32)(A), "shall, to the extent intended for human consumption, be treated, for purposes of any Federal law as a controlled substance in Schedule I." 21 U.S.C. § 813. Section 802(32)(A) states that

the term "controlled substance analogue" means a substance—

(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A)(i)-(iii).

■■■ The plain and unambiguous language of the statute consists of a main clause, "the term 'controlled substance analogue' means a *substance,*" followed by a dash and a series of three subordinate relative clauses signaled by the pronoun "which": (1) "the chemical structure of which is substantially similar to ..." (or, recast slightly "of which the chemical structure is substantially similar to ..."); (2) "which has a stimulant ..."; and (3) "which such person represents or intends to have ...." *See id.* Each of the three subordinate clauses occupies the same structural position of subordination relative to the main clause, and each is sepa-

rated by a semicolon, with the last two clauses being separated by the disjunctive "or." As a general rule of statutory construction, an "or" placed before the last term in a series indicates that each term in the series is intended to be read in the disjunctive and given separate meaning. *See United States v. Urban,* 140 F.3d 229, 231 (3d Cir.1998) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings unless the context dictates otherwise." (internal quotations omitted)). The structure of section 802(32)(A) and the plain meaning of its language compel the conclusion that this is an ordinary disjunctive series. In all three clauses, a dependent relative clause modifying a precedent noun is signaled by the relative pronoun "which." In each case, the precedent noun is "a substance," which is found in the main clause.

■■■ The defendants essentially ask the Court to read the "which" in clauses (ii) and (iii) as signaling dependent clauses modifying the term "chemical structure" in clause (i), also a dependent clause, rather than the term "substance" in the dominant main clause. Under this reading, clauses (ii) and (iii) would be subordinate to clause (i). The defendants offer no rationale, however, to vary the basic rules of the English language. The "which" in clause (i) introduces a possessive relative clause, and the "which" in both clauses (ii) and (iii) introduces dependant adjectival relative clauses. Under the fundamental principles of English grammar, all three "whichs" are relative pronouns introducing dependent relative clauses. As already noted, the clauses are *equally* subordinate, *i.e.,* clauses (i), (ii), and (iii) are coequal in terms of their structural subordination to the main clause. The defendants advance no contrary rule or other basis for me reasonably to conclude that subordinate relative clauses (ii) and (iii) modify a noun

in another subordinate clause rather than a noun in the main or dominant clause.

In addition, the very linguistic structure of the statute precludes a two-pronged conjunctive reading. If Congress had intended that clause (i) be read in conjunction with either clause (ii) or (iii), it surely knew how to structure the definition to make that clear. Indeed, at least up through October 8, 1986, the House version of the bill defining a controlled substance analogue was organized in that way, before it was modified and enacted as section 802(32)(A) by both houses of Congress on October 17, 1986. The earlier, unmodified House version was structured as follows:

> [T]he term 'controlled substance analogue' means a substance—
>
> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; *and*
>
> (ii)(I) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system; *or*
>
> (II) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially

similar to [that] of a controlled substance.

*See* H.R. REP. No. 99–848, pt. 1, at 1 (1986) (setting forth text of H.R. 5246, the proposed amendment to the Controlled Substances Act); 132 CONG. REC. 29634, 29640(1986) (same) (emphasis added).

When section 802(32)(A) emerged from conference and was passed in its present form by both the House and Senate,[2] the Congress had (1) omitted "and" from the end of clause (i); (2) added language requiring proof of "substantially similar" effect in clause (ii); and (3) eliminated the "(I)" and "(II)" in clause (ii) as signals of alternative conjunctive terms. *See* Controlled Substance Analogue Enforcement Act of 1986, Pub.L. 99–570, tit. I, subtit. E, sec. 1203, § 102, 100 Stat. 3207, 3213 (codified at 21 U.S.C. § 802(32)(A)). Although I do not need it to interpret the plain words of the statute, this little bit of legislative history virtually compels my conclusion that the Congress fully intended the three subordinate clauses to constitute alternative definitions providing three separate and independent bases for prosecution.

Finally, if I were to read section 802(32)(A) as the defendants urge, this

**2.** By Oct. 17, 1986, the House of Representatives had "concurred in the Senate amendment to the House amendment to the Senate amendment with an amendment" containing the language as finally enacted:

> [T]he term 'controlled substance analogue' means a substance-
> (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulent [sic], depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; [or]

> (iii) with respect to a particular person, which such person represents or intends to have a stimulent [sic], depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

132 CONG. REC. 32717, 32732 (1986). The statute as passed contains the word "or," although "or" does not appear in the text of the bill as printed in the Congressional Record on October 17, 1996. *See* Controlled Substance Analogue Enforcement Act of 1986, Pub.L. 99–570, tit. I, subtit. E, sec. 1203, § 102, 100 Stat. 3207, 3213 (1986).

Court would have to judicially legislate the word "and" back into the statute between clauses (i) and (ii). Even if I were inclined to do so, this Court has no authority to rewrite a statute by inserting a word the Congress deliberately removed from the bill it enacted and the President signed into law. Because the district court opinion upon which defendants rely engaged in just such prohibited judicial legislation to arrive at its holding that "a substance may be a controlled substance analogue only if it satisfies clause (i) and clauses (ii) or (iii)," I decline to follow it. *See United States v. Forbes,* 806 F.Supp. 232, 238 (D.Colo.1992) (holding the controlled substance analogue statute unconstitutionally vague as applied to an unrestricted legal drug, because "it provides neither fair warning nor effective safeguards against arbitrary enforcement").

The defendants in *Forbes* were charged with distributing an anti-depressant sold to the public since 1960 under the name "Monase," a substance which they allegedly purchased legally through the mails from a chemical company. *See id.* at 233. *Forbes* first noted that "as a simple matter of grammar, when an 'or' is placed before the last term in a series, each term in the series is usually intended to be disjunctive," meaning that the substance would be an analogue if it satisfied any of the three clauses. *Id.* at 235. The court nevertheless rejected this plain reading of the language of the statute and agreed with the defendants' two-pronged interpretation. In doing so, the court ignored the pronoun "which" in clause (i) ("the chemical structure of *which* ") identifying (i) as a dependent relative clause modifying the precedent noun "substance" in the main clause. After thus ignoring the first "which," *Forbes* then misapplied the rule that modifying phrases and clauses generally refer to the immediately preceding noun phrase or clause by ignoring the noun generating the series ("substance") and arbitrarily picking "chemical structure" in subsection (i) as the precedent noun modified by relative clauses (ii) and (iii). *See id.*

The court then conjured up a couple of hypothetical substances upon which to misapply the "deeply rooted rule of statutory construction" that a statute must be construed to "avoid unintended or absurd results." *See American Tobacco Co.,* 456 U.S. at 71, 102 S.Ct. 1534. Without citing any supporting scientific or medical evidence, the judge in *Forbes* opined that "if I ... read clause (ii) independently, alcohol or caffeine would be controlled substance analogues because, in concentrated form, they can have depressant or stimulant effects substantially similar to a controlled substance." *See Forbes,* 806 F.Supp. at 235. Similarly, if clause (iii) were read independently, "powdered sugar would be an analogue if a defendant represented that it was cocaine, effectively converting this law into a counterfeit drug statute." *See id.* To prevent these so-called "unintended results," the court held that "clause (i) must apply to any substance that the government contends is a controlled substance analogue." *See id.*

Because none of these factual constructs were before the court in *Forbes,* or are before me, I merely observe that alcohol is alcohol, whether 80 proof or 180 proof. Second, any hypothetical "coffee" that could be concentrated to satisfy clause (ii)'s definition of controlled substance analogue would not be the coffee we buy at the grocery store, and perhaps should be treated as a controlled substance analogue. Third, *Forbes'* conjoining of clause (iii) with clause (i) creates as much a counterfeit drug law as reading clause (iii) independently. *Forbes* would allow a person to be prosecuted for falsely representing that a substance has a substantially similar effect on the central nervous system even

though it does not affect the central nervous system substantially similarly to a schedule I or II controlled substance.

Having imagined an ambiguity in section 802(32)(A), the *Forbes* court concluded that Congress "essentially adopt[ed] the House definition," *see id.* at 236 (citing H.R. REP. No. 99–848 (1986)),[3] in spite of the clear legislative history I have reproduced above demonstrating that Congress rejected the House's initial two-pronged conjunctive approach in favor of the three-pronged disjunctive definition in the final and plain language of the statute. While the court duly noted that the word "and" had been dropped from the end of clause (i), it simply dismissed this change as "inexplicabl[e]" without mentioning the other significant language changes. As already discussed, the Congress not only omitted the "and" at the end of clause (i), it also added language requiring proof of "*substantially* similar" effect in clause (ii) and eliminated the "(I)" and "(II)" in clause (ii) as signals of alternative conjunctive terms. *See* discussion *supra.* Notably, the proposed House definition required proof of only "a stimulant, depressant, or hallucinogenic effect on the central nervous system" under clause (ii)(I). *See* H.R. REP. No. 99–848, at 7

(1986). Clearly, then, the House never intended to require that the prosecution prove both a *substantially similar* structure and a *substantially similar* effect, as *Forbes* would require under clauses (i) and (ii) of the actual statute.[4]

As an illustration of the House's *proposed* conjunctive definition and its proper limits, the House report stated: "Coffee, for example, has a stimulant effect on the central nervous system, but it is not chemically substantially similar to a controlled substance." *See id.* The *Forbes* court found this illustration, along with the proposed two-pronged definition and the House report in general, somehow "to be persuasive legislative history as to Congress' intent underlying its definition of a controlled substance analogue." *See Forbes*, 806 F.Supp. at 236. Even if I could agree that the House report supports the *Forbes* analysis, which I cannot, available Senate materials more persuasively support the opposite conclusion.

Early Senate drafts of the controlled substance analogue statute reveal that the Senate likewise never intended to require proof of both substantial similarity to a controlled substance in chemical structure and substantial similarity in effect on the

---

**3.** The court in *Forbes* mistakenly cites the House report as H.R.Rep. No. 99–948 (1986). The correct citation is H.R. REP. No. 99–848 (1986).

**4.** According to the House report, a pre-introduction discussion draft of the House bill originally "proposed that the effect test in the second branch of the definition require that the analogue's effect be 'substantially similar' to the effect of a controlled substance." Because the Drug Enforcement Administration

had expressed concern that the conjunctive requirement of chemical structure and a "substantially similar" central nervous system effect might be difficult to prove ... Mr. Hughes modified the effect requirement in the bill so that the evidence of central

nervous system effect is minimal compared to the research burden that Drug Enforcement Administration has to sustain in order to bring a drug under control. Indeed, as defined in the bill, a person could be convicted of felony offenses regarding a particular controlled substance analogue which *as a substance could not be scheduled under the Controlled Substances Act.*
H.R. REP No. 99–848, at 7 (1986) (emphasis added). Note that the House recommended passage of a statute that would allow prosecution even though the substance's lack of effect on the central nervous system means that it cannot be a schedule I or II substance. This would have been without doubt the same kind of "counterfeit drug act" *Forbes* claims was unintended by Congress.

central nervous system. For example, on September 25, 1986, the Senate debated S. 2878, which contained the following definition:

The term 'controlled substance analog' as used in section 403A means a substance other than a controlled substance that has a chemical structure substantially similar to that of a controlled substance in schedule I or II *or* that was specifically designed to produce an effect substantially similar to that of a controlled substance in schedule I or II.

132 CONG. REC. 26099, 26103 (1986) (emphasis added).[5] On October 10, 1986, the Senate amended the definition to read:

Except as provided in subparagraph (B), the term 'controlled substance analogue' means a substance-

(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; *or*

(ii) which was specifically designed to produce an effect substantially similar to, or greater than, the effect of a controlled substance in schedule I or II.

132 CONG. REC. 30322, 30329 (1986) (emphasis added); 132 CONG. REC. 30508, 30515 (1986) (same language).

Furthermore, the Senate Judiciary Committee expressly addressed whether the statute should require both a substantially similar chemical structure and a substantially similar effect. After appearing before the Senate Committee on the Judiciary on September 19, 1986, the Department of Justice reiterated most emphatically that to read the Senate version of the bill in the conjunctive (as the *Forbes* court later did) would "defeat the purpose of the bill." [6] The Senate obviously heeded this caution, since the later Senate versions of the bill retained the disjunctive structure.

As the bill progressed through the legislative process, neither the House nor the Senate ever evidenced an intention to create a statute that would require proof of both a substantially similar chemical structure and a substantially similar effect on the nervous system. The final version, an amalgam of the House and Senate versions, effectively transformed the House's original two prongs into three prongs, deleted the House's conjunctive "and," included the Senate's "substantially similar" language in subpart (ii), and retained the disjunctive "or" between subparts (ii) and (iii). Since there is no "clearly expressed legislative intention to the contrary," this

---

**5.** This definition reflects the original title of the bill in July, 1985, the "Designer Drug Enforcement Act of 1985," S.1417, with the purpose "to prohibit persons who specifically set out to manufacture or to distribute drugs which are substantially similar to the most dangerous controlled substances from engaging in this activity." S. REP. No. 99–196, at 5 (1985). A year later, in July, 1986, the House of Representatives took up consideration of the "Designer Drug Enforcement Act of 1986," H.R. 5246, which also dealt with underground chemists who slightly alter a controlled substance. H.R. REP No. 99–848, at 4 (1986). This seems to be the source of the fundamental premise of the court in *Forbes*, namely, that "[t]he analogue statute is directed at underground chemists who

tinker with the molecular structure of controlled substances to create new drugs that are not scheduled." *Forbes*, 806 F.Supp. at 236. Although this may have been the purpose and intended scope of the bills when first introduced, the purpose and scope obviously changed and expanded as the legislation progressed through both houses and was ultimately enacted into law. This change in purpose and scope is reflected in the more inclusive title, "Controlled Substance Analogue Act."

**6.** *See Controlled Substance Analogs Enforcement Act of 1985: Hearing Before the Senate Comm. on the Judiciary on S. 1437,* 99th Cong. 35 (1985) (letter from Stephen G. Trott, Assistant Attorney General).

Court must follow the Supreme Court's directive and regard the plain language of section 802(32)(A) as conclusive. *See American Tobacco Co.,* 456 U.S. at 68, 102 S.Ct. 1534. I will not select a portion of the act's legislative history in order to rewrite the statute the way the defendants think it should have been written. Importantly, there is nothing in the legislative history of the Controlled Substance Analogue Act of 1986 to hint that Congress did not intend to provide for prosecution of persons as illegal drug traffickers who falsely represent that a substance has the same effect as a schedule I substance. As evidenced by the violence and gunfire attending the defendants' transaction, the statute as plainly interpreted addresses many of the same evils involved when real crack cocaine is sold.

As enacted, 21 U.S.C. § 802(32)(A) has three plainly and unambiguously disjunctive definitional clauses. Section 802(32)(A) makes it equally possible to prosecute a person for distributing a substance (1) which has a chemical structure substantially similar to the chemical structure of a schedule I or II controlled substance; *or* (2) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to that of a schedule I or II controlled substance; *or* (3) which he or she represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to that of a schedule I or II controlled substance. This is the plain meaning of the language of the statute, which is conclusively presumed to represent the intent of Congress.

Therefore, this Court holds that a substance may be a controlled substance analogue if it satisfies subsection (i), (ii), or (iii) of 21 U.S.C. § 802(32)(A).

## B. Sufficiency of the Evidence

Both defendants assert that the evidence was insufficient to prove that they intended the flour and wax substance to be consumed by a human being or that either "represented or intended that the flour and wax substance ha[s] an effect on the central nervous system of Michael Patrick or Ickal Stewart that was substantially the same as, or greater than, the effect of a Schedule I or Schedule II substance." (*See* Def. Greig's Mot. at 1; *see also* Def. Hodge's Mot. at 8.) These claims are without merit.

■ In considering a motion for judgment of acquittal based on insufficiency of the evidence, the Court views the evidence in the light most favorable to the government and draws all reasonable inferences to determine whether there was substantial evidence upon which a reasonable jury could have based its verdict. *See Walters v. Government of the Virgin Islands,* 36 V.I. 101, 135 F.3d 764 (3rd Cir.1997). Viewed under this standard, there was ample evidence at trial to support the jury's verdict. The jury could have reasonably found that the defendants represented to undercover buyers that the substance they offered for sale was crack cocaine, thereby representing that it would have the identical stimulant effect on the buyers' central nervous system as a schedule I controlled substance.

The defendants' remaining contentions are without merit. Accordingly, the defendants' motions for judgment of acquittal based on insufficiency of the evidence will be denied.

## II. MOTION FOR A NEW TRIAL

In addition to his motion for a new trial based on juror misconduct, defendant Greig moves for a new trial on the grounds (1) that the admission of the hearsay statement of co-defendant Yambo Williams "im-

properly gave additional credibility to the witnesses credibility"; (2) that the verdict against Greig was against the weight of the evidence; and (3) the admission of inadmissible evidence and the exclusion of admissible, relevant material evidence deprived Greig of a fair trial.

These assertions are without merit.

## III.  CONCLUSION

For the foregoing reasons, the Court will deny the defendants' motions for judgment of acquittal and for a new trial.

### ORDER

**THE PREMISES CONSIDERED,** and for the reasons delineated in the Court's Memorandum Opinion of even date, it is hereby

**ORDERED** that the· defendants' motions for a judgments of acquittal and for a new trial are **DENIED.**