UNITED STATES of America

v.

**Lloyd T. CLIFFORD, Donald Dwayne Sellman, and Daniel Edward Johnson**

No. CRIM.01–435–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

April 23, 2002.

Curtiz Gomez, U.S. Atty's Office, Alexandria, VA, for Plaintiff.

Alan H. Yamamoto, Alexandria, VA, Thomas Durbin Hughes, IV, Alexandria, VA, Glen Allen Trimper, Alexandria, VA, for Defendants.

## *MEMORANDUM OPINION*

ELLIS, District Judge.

At issue in this matter is whether the three defendants violated 21 U.S.C. § 846, Conspiracy to Possess and Distribute a Controlled Substance Analogue, when they represented to a purchaser that the pills they were selling him contained 3,4–methylenedioxymethamphetamine (MDMA), a federally-controlled substance, when in fact the pills contained nothing more than ginseng and vitamin B. More specifically, the question presented is whether pills containing ginseng and vitamin B, when represented to contain a schedule I controlled substance, constitute a "controlled

substance analogue" under 21 U.S.C. § 802(32)(A).

## I.

The three defendants in this matter, Lloyd T. Clifford, Donald Dwayne Sellman, and Daniel Edward Johnson devised a scheme in which they would buy quantities of pills containing ginseng and vitamin B, repackage the pills, and then sell them at a handsome profit by representing them to be MDMA, commonly known as "ecstacy," "XTC," or simply "E." Pursuant to this scheme, Clifford advised a potential MDMA customer, who as it turned out, was a confidential informant (the "CI") that he could sell the CI a quantity of MDMA pills. The CI agreed to buy 500 MDMA tablets from Clifford and the transaction occurred the next day, with Clifford and Johnson delivering to the CI 500 pills they represented to contain MDMA in return for $5,250. In fact, the pills contained no MDMA, but were only over-the-counter ginseng tablets. At the time of this initial transaction, Clifford and Johnson also informed the CI that they could provide him with 5,000 additional MDMA pills at $5 to $6 per pill and that they could fulfill the CI's future requests for MDMA. In fact, defendants never intended to supply the CI with anything other than over-the-counter pills, which defendants knew did not have the stimulant, depressive, or hallucinogenic effects on the central nervous system that are the hallmark of listed controlled substances.

Consistent with their intention, defendants consummated a second transaction with the CI a few weeks later. On this occasion, defendants sold the CI 1,000 pills they represented were MDMA, but in fact contained only vitamin B. The sale price was $9.25 per pill. Defendants were arrested shortly thereafter and subsequently indicted on three charges:

(i) conspiracy to possess and distribute a controlled substance analogue, in violation of 21 U.S.C. § 846;[1]

(ii) conspiracy to steal money and other property of the United States, in violation of 18 U.S.C. § 371; and

(iii) forfeiture of drug-related assets, pursuant to 21 U.S.C. § 853.

The three defendants pled guilty[2] to conspiracy to possess and distribute a controlled substance analogue, in violation of Count I of the three count indictment. Pursuant to the terms of the plea agreement, Counts II and III were dismissed. Clifford and Sellman were scheduled to be sentenced on March 29, 2002, whereas Johnson was scheduled to be sentenced on April 12, 2002.

At the sentencing hearing for Clifford and Sellman on March 29, the Court *sua sponte* raised the question whether the sale of ginseng and vitamin B, represented to be MDMA, was covered by 21 U.S.C. § 802(32)(A). The parties were directed to submit supplemental memoranda on this question and whether an order should issue (i) vacating the order dismissing Counts II and III of the indictment, (ii) vacating defendants' plea of guilty to Count I of the indictment, (iii) dismissing Counts I and III of the indictment, and (iv) ordering the prosecution to proceed only as to Count II of the indictment. Following two hearings, the Court ruled that defendants' conduct was not covered by the controlled substance analogue statute and hence the Court (i) vacated the Janu-

---

**1.** For purposes of federal law, a controlled substance analogue is to be treated as a schedule I controlled substance. *See* 21 U.S.C. § 813.

**2.** The three defendants pled guilty on different dates: Sellman pled guilty on January 14, 2002; Clifford pled guilty on January 15, 2002; Johnson pled guilty on January 28, 2002.

ary 28, 2002 order dismissing Counts II and III of the indictment, (ii) vacated defendants' pleas of guilty to Count I of the indictment, (iii) dismissed Count I, and, accordingly, Count III of the indictment, and (iv) ordered the prosecution to proceed to trial as to Count II of the indictment. This memorandum opinion sets forth the reasons for this ruling.

## II.

The central question presented is whether ginseng or vitamin B, misrepresented to be MDMA, fits within the statutory definition of a "controlled substance analogue" in 21 U.S.C. § 802(32)(A). If so, then, in accordance with their pleas, defendants may be found guilty of conspiracy to possess and distribute a controlled substance analogue, in violation of 21 U.S.C. § 846, and their pleas were valid. But if not, then defendants' conspiracy to sell ginseng and vitamin B pills to the CI, representing those pills to contain MDMA, might violate some federal criminal law, but it would not violate Section 846.

Passed as part of the Anti–Drug Abuse Act of 1986, 99 P.L. 570; 100 Stat. 3207 (1986), the Controlled Substance Analogue Enforcement Act of 1986 provides that the term "controlled substance analogue" means a substance-

(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depres-

sant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A). Whether the ginseng and vitamin B pills sold by defendants are a controlled substance analogue under Section 802(32)(A) presents a question of statutory construction. More particularly, the question is whether the statute requires subsection (i) to be read in the conjunctive or the disjunctive with respect to subsections (ii) and (iii). Put another way, to establish that a substance is a controlled substance analogue, is it necessary to show subsection (i) *and then* either subsection (ii) or subsection (iii), as defendants argue (hereinafter the "conjunctive interpretation"), or is it sufficient to establish any one of the subsections alone, as the government contends (hereinafter the "disjunctive interpretation")? Here, it is undisputed that defendants represented that the pills they sold were MDMA, thus clearly satisfying subsection (iii). Thus, if the disjunctive interpretation of Section 802(32)(A) governs, defendants plainly conspired to possess and distribute a controlled substance analogue. Yet, if the conjunctive interpretation applies, then defendants could not have conspired to possess and distribute a controlled substance analogue because ginseng and vitamin B clearly lack a chemical structure similar to MDMA or any other schedule I or II controlled substance. Thus, defendants' guilt or innocence with respect to Counts I and III of the indictment turns on the statutory interpretation of 21 U.S.C. § 802(32)(A).

Although this statutory interpretation question has not been resolved in this circuit, it is not entirely novel; at least three district courts have had occasion to engage

this issue. Two have determined that the conjunctive interpretation is appropriate,[3] while another has opted for the disjunctive interpretation.[4] In these circumstances-the absence of either controlling authority or persuasive uniform authority-the task of statutory interpretation must be undertaken anew.

When interpreting a statute, it is well-established that "[a]ny analysis... must begin with the plain meaning of the statute itself." *Chris v. Tenet,* 221 F.3d 648, 651–52 (4th Cir.2000). Of course, it is improper to confine the interpretation of a statute to the one section or sections to be construed;[5] rather, it is appropriate to interpret the Controlled Substance Analogue Enforcement Act as a whole.[6] And, only if a statute's plain meaning is ambiguous is it proper to consider the statute's structure and purpose so as to ascertain Congress's intent. *See United States v. Jackson,* 759 F.2d 342, 344 (4th Cir.1985); *Johnson v. Garraghty,* 57 F.Supp.2d 321, 326 (E.D.Va.1999). Thus, the analysis here must begin with the question whether the statute has a plain and unambiguous

meaning or is instead infected with an ambiguity.

To be sure, it can be argued, as the district court concluded in *United States v. Greig,* 144 F.Supp.2d 386, 389 (D.Vi.2001), that because "[e]ach of the three subordinate clauses occupies the same structural position of subordination relative to the main clause, and each is separated by a semicolon, with the last two clauses being separated by the disjunctive 'or'," the series is intended to be read disjunctively. *Id.* Although this point is not without force,[7] it is neither conclusive, nor ultimately convincing. This is so because there is in fact no universally recognized or authoritatively stated rule of structure to the effect that a series of subordinate clauses must be read in the disjunctive if the penultimate and final clauses are separated by "or."[8] While some or even many may invariably follow such a convention, it is clear that Congress is not in this group. Indeed, elsewhere in the very same statute, specifically Section 802(9), Congress elected to follow a contrary convention. There, Congress listed a number of subor-

---

3. *See United States v. Forbes,* 806 F.Supp. 232 (D.Colo.1992); *United States v. Roberts,* 2001 WL 1646732 (S.D.N.Y.2001).

4. *See United States v. Greig,* 144 F.Supp.2d 386 (D.Vi.2001), *appeal docketed,* No. 01–2199 (3d Cir. May 14, 2001).

5. *See Harrison v. Northern Trust Co.,* 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407 (1943); *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952).

6. It has been held that a statutory subsection should not be construed in a vacuum; rather, it must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter. *See, e.g., In re Air Crash Off Long Island, New York, on July 17, 1996,* 1998 WL 292333 (S.D.N.Y.1998); *United States v. McCord,* 33 F.3d 1434 (5th Cir.1994); *F.T.C. v. University Health, Inc.,* 938 F.2d 1206 (11th Cir.1991).

7. Even the court in *Forbes,* which ultimately adopted the conjunctive interpretation, noted that "[a]s a matter of simple grammar, when an 'or' is placed before the last term in a series, each term in the series is *usually* intended to be disjunctive." *Forbes,* 806 F.Supp. at 235 (emphasis added).

8. Neither the *Greig* nor the *Forbes* decisions cite any authority of reference for this convention. Nor does the convention find expression in *Statutes and Statutory Construction,* the principal authoritative text on statutory interpretation. *See* Norman J. Singer, *Statutes and Statutory Construction* § 46.05 (6th ed.2000). And even if some text mentions this so-called convention, it lacks the authoritative force of a dictionary definition of a word, which is the typical basis for a finding of clear and unambiguous meaning.

520

dinate clauses in a fashion similar to Section 802(32)(A), but placed the term "or" after every subsection to denote a clear disjunctive intent. *See* 21 U.S.C. § 802(9).[9] Given the well-established principle of statutory construction that no part of a statute should be rendered inoperative or superfluous,[10] it follows that Congress apparently felt it necessary, at least in that instance, to place "or" between each subordinate clause to require or ensure a disjunctive reading. So it is clear, therefore, that Congress itself does not invariably follow the convention advocated in *Greig,* nor is there any certain means of determining when it intends to do so and when it does not. Thus, the mere existence of "or" between the last two subordinate clauses cannot be taken to be conclusive evidence that Congress intended all the subordinate clauses to be read in the disjunctive.[11] And, this point alone suggests that there is an ambiguity in whether the subordinate clauses should be accorded the disjunctive interpretation or the conjunctive interpretation.

But the problematical status of this convention is not the only reason pointing to the statute's ambiguity; an additional, more compelling reason is that the word "analogue," which Congress chose to include in Section 802(32)(A) as demarcating the statute's scope, has a settled meaning that is consistent with the conjunctive in-

terpretation, but flatly inconsistent with the disjunctive interpretation. An analogue, defined in the chemical context, is a "structural derivative of a parent compound that often differs from it by a single element."[12] This definition fits well within subsection (i), but not within either subsections (ii) or (iii). Accordingly, only a conjunctive interpretation of the subsections {(i) and [ (ii) or (iii) ]} is faithful to the plain meaning of analogue. This point, if not conclusive in favor of the conjunctive interpretation, is surely compelling evidence of the statute's ambiguity in this regard.

Given this ambiguity, the interpretive task appropriately expands to include consideration of the statute's purpose, as reflected in its language and structure as a whole and in its legislative history. *See Jackson,* 759 F.2d at 344; *Johnson,* 57 F.Supp.2d at 326. In this regard, the evidence favoring a conjunctive interpretation of the subsections is compelling. As noted, in choosing to use the term "analogue" to define the statute's scope, Congress made clear its intention to limit that scope to substances with structures chemically similar to controlled substances.

■ Equally compelling is the statute's legislative history. There is not a scintilla of evidence in the legislative history that Congress intended to cover and criminal-

**9.** *But cf.* 21 U.S.C. § 802(25) (using the same structure as 21 U.S.C. § 802(32)(A)).

**10.** *See, e.g., Office of Consumers' Counsel, State of Ohio, v. F.E.R.C.,* 783 F.2d 206 (D.C.Cir.1986); *United States v. Union Gas Co.,* 792 F.2d 372 (3d Cir.1986).

**11.** For this reason, courts have cautioned against relying too heavily upon characterizations such as "disjunctive" or "conjunctive" to resolve complex questions of statutory interpretation. *See Kelly v. Wauconda Park Dist.,* 801 F.2d 269, 270 n. 1 (7th Cir.1986) (warning that "there are dangers in attempt-

ing to rely too heavily on characterizations such as 'disjunctive' form versus 'conjunctive' form to resolve difficult issues of statutory construction"); *Byte Intern. Corp. v. Maurice Gusman Residuary Trust No. 1,* 629 So.2d 191, 192 (Fla.Dist.Ct.App.1993) (holding that "courts may construe 'and' as 'or' in statutes where a construction based on the strict reading of the statute would lead to an unintended or unreasonable result and would defeat the legislative intent of the statute").

**12.** *The American Heritage College Dictionary* 48 (3d. ed.1993).

ize sales of legal substances such as flour, salt, ginseng, vitamin B, etc., merely because the seller represents they will yield a stimulant, depressant, or hallucinogenic effect like that of a controlled substance. Nowhere in the legislative history is there any mention or even a suggestion of such a prospect. Instead, the available legislative history indicates unequivocally that the Controlled Substances Analogue Act was, from its inception, designed to combat the problem of persons who seek to avoid the reach of federal criminal drug laws by manufacturing or distributing substances that are not listed controlled substances but which are specifically designed to provide effects that are substantially similar to the effects of listed substances. As the district court in *Forbes* rightly observed, "[t]he [controlled substance] analogue statute is directed at underground chemists who tinker with the molecular structure of controlled substances to create new drugs that are not scheduled." 806 F.Supp. at 235. Indeed, the Senate's version of the bill was aimed to confront the "truly frightening problem" [13] of "persons who specifically set out to manufacture or to distribute drugs which are substantially similar to the most dangerous controlled substances...." [14] Like its counterpart in the Senate, the

House bill focused on underground chemists who sought to evade drug laws by slightly altering controlled substances. [15] Thus, it is clear that only the conjunctive interpretation effectuates the clear purpose of the statute, namely to criminalize the manufacture and distribution of unlisted substances that are chemically related to listed substances and either have similar effects or are represented to have similar effects. There is simply no indication in the legislative history that the Controlled Substances Analogue Enforcement Act was meant to forbid individuals from passing off over-the-counter nutritional supplements or vitamins as controlled substances. [16]

The government presents two flawed arguments in support of the proposition that the legislative history supports its position. Noting that weeks before the act passed, the three subsections were numbered (i), (ii)(I), (ii)(II) and that the term "and" was written after subsection (i), the government argues that the subsequent omission of the word "and" and the renumbering of the subsections indicates Congress's clear intent to require the disjunctive interpretation. Yet, there is no evidence establishing the reason for this change. Indeed, it is just as likely that the change was inad-

---

13. 131 Cong. Rec. S17,842–04 (daily ed. Dec. 18.1985) (statement of Senator Thurmond).

14. S.Rep. No. 196, 99th Cong., 1st Sess. 5 (1985).

15. *See* H.R.Rep. No. 948, 99th Cong., 2d Sess. 4 (1986).

16. That the disjunctive interpretation yields this and other anomalous or unintended results is another argument in support of the conjunctive interpretation. As noted in *Forbes,* the disjunctive interpretation might result, arguably, in having coffee or alcohol treated as a controlled substance analogue, a result clearly counter to Congress's intent.

*See* 806 F.Supp. at 235; H.R. Rep. No. 948, 99th Cong., 2d Sess. 4 (1986). In this regard, the government notes that subsection (ii) would not include caffeine or alcohol because these substances, while they do produce a stimulant or depressant effect, do not produce an effect substantially similar to that of a scheduled controlled substance. Even granting this, subsection (ii) might nonetheless prohibit use of other presumably legal substances, such as dextromethorphan, the cough suppressant component of most over-the-counter cough medications. Dextromethorphan has no analgesic or addictive properties, but acts on the central nervous system to produce feelings of well-being and an enhanced awareness and appreciation of visual and auditory stimuli.

vertent as that it was deliberate. Had the change been deliberate, it would have effected a quite radical alteration in the statute's scope, criminalizing not just designer drug trafficking, but also distribution of all manner of lawful substances merely because they are represented to be listed substances. Such a radical alteration would surely have occasioned some comment or remark from Congress. The silence in this regard speaks loudly in favor of inadvertence as the explanation for the change.

The government also raised at oral argument that the name of the statute was changed was from the "Designer Drug Enforcement Act" to the "Controlled Substance Analogue Enforcement Act" to signify that the scope of the statute was expanded to include defendants' situation. The legislative history disagrees. Rather "[t]he name 'analogue' was substituted for 'designer drugs', because such a name is 'too appealing a name for these killers.'" 131 Cong. Rec. S13,167–02 (daily ed. Oct. 10, 1985) (statement of Senator D'Amato).

Although not directly in point, the Fourth Circuit's decision in *United States v. Sampson,* 140 F.3d 585 (4th Cir.1998) is instructive. There, the court held that "flex," a mixture of flour, wax, and baking soda, although sold as cocaine, was not a "counterfeit substance," as defined in 21 U.S.C. § 802(7). In reaching this result, Judge Motz observed that

> [s]elling flex does not constitute a crime *punishable by any known federal law.* Simply because a substance looks like cocaine, and the defendant misrepresents to his unsuspecting purchaser that the substance is cocaine, does not make the mere distribution of that substance a violation of the federal narcotics laws.

*Id.* at 589 (emphasis added). By the same token, passing off ginseng and vitamin B as MDMA is not "punishable by any known federal law." *Id.* To be sure, as the government argues, this statement was made in the context of Section 802(7), which defines counterfeit substances, not Section 802(32)(A), which defines controlled substance analogues, and is therefore arguably *dictum.* Yet, there is no reason to believe that Judge Motz and the panel were unaware of Section 802(32)(A) when they made this remark.[17]

Finally, it must be noted that the rule of lenity has no role to play in the interpretative task of the statute. This follows from this circuit's rule that for the rule of lenity to operate, "there must be a grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seized everything from which aid can be derived, it is still left with an ambiguous statute." *United States v. Photogrammetric Data Services, Inc.,* 259 F.3d 229, 249 (4th Cir.2001) (internal citations and quotation marks omitted). Here, after considering the statute's language, structure, and purpose, it is clear that Congress intended Section 802(32)(A) to be read conjunctively.

For these reasons, defendants' pleas of guilty to Count I of the indictment were vacated and Counts I and III of the indictment dismissed.

---

**17.** Of course, while defendants may not have violated federal drug enforcement laws by selling ginseng and vitamin B as MDMA, their conduct might well have violated other federal criminal laws, including 18 U.S.C. § 371, conspiracy to steal money and other property of the United States, as charged in Count II of the indictment.