

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-23-1998

# United States v. Urban

Precedential or Non-Precedential:

Docket 97-7107

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Urban" (1998). *1998 Decisions.* Paper 56.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/56

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 20, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7107

UNITED STATES OF AMERICA

v.

FREDERICK URBAN,

     Appellant

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Crim. No. 95-00108)

Argued October 21, 1997

BEFORE: MANSMANN and GREENBERG and
ALARCON,* Circuit Judges

(Filed March 20, 1998)

     John C. Gurganus, Jr. (argued)
     Office of United States Attorney
     309 Federal Building
     Scranton, PA 18501

     Attorney for Appellee

_____

* Honorable Arthur L. Alarcon, United States Senior Circuit Judge for the
Ninth Circuit, sitting by designation.

Daniel I. Siegel (argued)
Office of Federal Public
Defender
100 Chestnut Street
Harrisburg, PA 17101

Attorney for Appellant

OPINION OF THE COURT

ALARCON, Circuit Judge.

Frederick Urban appeals from the judgment of conviction for possession of an unregistered destructive device in violation of 26 U.S.C. SS 5841, 5861(d), and 5971. He contends that the district court committed prejudicial error in refusing to instruct the jury that the intent to use the components as a weapon is an element of the crime charged in the indictment. Urban also argues that the district court erred as a matter of law in applying the special skill enhancement under United States Sentencing Guideline S 3B1.3 ("S 3B1.3"). We affirm the judgment of conviction because we conclude that the district court properly instructed the jury. We also determine that the district court properly applied a two-level sentence enhancement for the use of a special skill in a manner that significantly aided the commission of the crime.

I

In late 1994, Frederick Urban ("Urban") began to frequent a local gun store owned by Patrick Moreton. Urban gave Moreton a number of pamphlets entitled "1-2-3-4 Easy Made C-4" to sell on a consignment basis. Urban claimed to have written the pamphlet, which set forth directions on how to manufacture triacetonetriperoxide ("TATP"), an extremely volatile explosive. Urban continued to visit the store, and to discuss his ideas about manufacturing explosives. In early April, Urban met with Moreton's father, John, to discuss the possibility of building an aluminum "grenade-type launcher." Urban told the elder Moreton that he had a cache of TATP buried in his backyard.

2

Unbeknownst to Urban, John Moreton was an informant for the Alcohol, Tobacco and Firearms Division of the Department of the Treasury ("ATF"). John Moreton informed Kevin Simpson, an ATF agent, of Urban's activities, and the ATF set up a sting operation.

In his discussions with John Moreton, Urban stated that TATP could breach a three-inch steel plate. The two arranged to meet and test the explosive power of TATP. On April 11, 1995, Urban and Moreton met in the parking lot of a highway rest stop. ATF agents arrested Urban when he removed a large ammunition box from his van and placed it in the trunk of Moreton's car. The ammunition box contained two large canisters, a homemade metal detonator, two large bags of an explosive later designated as TATP, two carbon dioxide cartridges, a coil of pyrotechnic fuse, and a steel pipe.

During a search of Urban's residence, ATF agents seized books and pamphlets on how to manufacture various weapons and explosives, a polyvinyl chloride ("PVC") container, a five-inch length of 3/32 fuse, an illegal firearm silencer, a partially filled container of smokeless gun powder, a homemade detonator, and three fuse assemblies. Urban was arrested and charged with the possession of an unregistered destructive device in violation of 26 U.S.C. S 5861(d). On April 18, 1995, Urban was indicted on one count of possession of an unregistered destructive device.

Urban was found guilty after a trial by jury. He has timely appealed from the judgment of conviction and the court's sentencing decision.

II

Urban argues that we must reverse because the district court erred in failing to instruct the jury on an essential element of the crime of possession of the components of an unregistered destructive device. He contends that the trial court was required to instruct the jury that the Government had the burden of producing evidence that he intended to use the components of an unregistered destructive device as a weapon. This court conducts a plenary review of a

3

challenge to a district court's instruction to the jury regarding the applicable law. United States v. Zehrbach, 47 F.3d 1252, 1260 (3rd Cir.), cert. denied, 514 U.S. 1067 (1995).

The question whether the Government has the burden of producing evidence and persuading the jury that the accused possessed the components of an unregistered destructive device with the intent to use them as a weapon presents an issue of first impression in this circuit.

We begin our analysis by examining the language used by Congress in creating the offense of possession of an unregistered firearm. Section 5861(d) of the National Firearms Act provides in pertinent part that "[i]t shall be unlawful for any person . . . to . . . possess afirearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. S 5861(d). Section 5861(d) makes no reference to the intent of the person in possession of an unregistered firearm.

Section 5845(f) defines the term "firearm" inter alia, as a "destructive device." A destructive device is defined in S 5845(f) as follows:

>    (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device;
>
>    (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and
>
>    (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not

4

> include any device which is neither designed nor
> redesigned for use as a weapon . . ..

26 U.S.C. S 5845(f) (emphasis added).

The terms "designed" and "intended" as used in S 5845(f)(3) are separated by the disjunctive word "or." "[C]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings unless the context dictates otherwise." United States v. 6109 Grubb Road, 886 F.2d 618, 626 (3d Cir. 1989) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979)). "Simply stated, a device may be `converted' into a destructive device as defined in Subparagraphs (1) and (2) by way of `design or intent.' " United States v. Oba, 448 F.2d 892, 894 (9th Cir. 1971), cert. denied, 405 U.S. 935 (1972) (citation omitted). Thus, looking solely at the plain meaning of the words used by Congress, a person may be found guilty of a violation of S 5861(d) if he or she is in possession of a combination of parts designed for use in converting any device into a destructive device, or if he or she is in possession of a combination of parts intended for use in converting any device into a destructive device.

Urban asks that we construe the language of the statute as requiring, in all cases where the prosecution is based on the possession of the components of an unregistered destructive device, that the jury must be instructed that the Government has the burden of persuading it that the defendant intended to use the components as a weapon. His reliance on United States v. Fredman, 833 F.2d 837 (9th Cir. 1987), United States v. Morningstar, 456 F.2d 278 (4th Cir.), cert. denied, 409 U.S. 896 (1972), and United States v. Curtis, 520 F.2d 1300 (1st Cir. 1971) for this sweeping proposition is misplaced.

In Fredman, police officers seized two bundles of commercial detonator cord, three commercial detonator fuses, and two commercial igniters in a search of the defendant's home. Id. at 837-38. Fredman was indicted for possession of an unregistered firearm. Id. at 838.

The Ninth Circuit reversed the judgment of conviction. The court held in Fredman that, "mere components of commercial explosives, absent proof of intent to use such

5

components as a weapon, fail to qualify as a `destructive device' within the meaning of 26 U.S.C. S 5845. Intent is a necessary element absent proof of original design or redesign for use as a weapon." Id. at 839 (emphasis added).[1] The court concluded that the components were not designed for use as a weapon "since it is admitted that the seized explosive components are designed for use as commercial blasting components." Id. Fredman establishes that intent to use the components as a weapon is a required element when the components are commercial in nature and are not designed or redesigned for use as a weapon.

In United States v. Morningstar, 456 F.2d 278 (4th Cir. 1972), the Fourth Circuit reversed the district court's dismissal of an indictment charging the defendant with possession of a destructive device. The device in Morningstar consisted of four sticks of commercial black powder pellet taped together and several unattached blasting caps. Id. at 279-280. In reversing the district court's ruling that commercial explosives are not covered under S 5861(d), the Morningstar court held that "explosives, such as commercial black powder or dynamite, are subject to the Omnibus Crime Control and Safe Streets Act and the National Firearms Act depending on their intended use." Id. at 281. The court also opined that "explosive and incendiary devices which have no business

_____

1. Urban suggests that we adopt the principle set forth in the Ninth Circuit's Jury Instruction 9.05B which provides in pertinent part that "[i]n order for the defendant to be found guilty . . . the government must prove . . . the defendant intended to use the components as a weapon." 9th CIR. CRIM. JURY INSTR. 9.05B (1995). In the comment to Jury Instruction 9.05B the jury instruction committee cited United States v. Fredman for the proposition that "[f]or unassembled components to qualify as a `firearm' there must be proof beyond a reasonable doubt that the components were intended for use as a weapon." This commentary ignores the fact that in the Fredman case the components were designed to be used for commercial blasting and not as a weapon. The rule set forth in Instruction 9.05B does not accurately reflect the Ninth Circuit's construction of S 5845(f)(3) in Fredman. We are also mindful of the principle that pattern jury instructions from other circuits are not binding authority. See United States v. Agnes, 753 F.2d 293, 299 (3d Cir. 1985).

6

or industrial utility . . . are covered regardless of their intended use." Id. at 280. Morningstar, like Fredman, reads S 5845(f) to include commercial explosive components when the prosecution is able to prove the defendant's intent to use the assembled device as a weapon, rather than for its legitimate, commercial purpose.

In United States v. Curtis, 520 F.2d 1300 (1st Cir. 1975), the defendants were prosecuted in separate counts for possessing two destructive devices. One device consisted of five sticks of dynamite bound together with a fuse attached. The other device consisted of eight to ten sticks of dynamite bound together and attached to a black box and a timer. Id. at 1301. As was the case in Morningstar, the defendants in Curtis argued that commercial explosives are not a destructive device within the meaning of S 5845(f). Id. at 1302.

The First Circuit held that "the government's evidence with regard to the smaller device was not sufficient to support a conclusion that the object was anything more than `the familiar industrial blasting charge.' " Id. at 1303 (citation omitted). In so ruling, the court recognized "the line of cases holding that a dynamite charge may become a destructive device if intended for use as a bomb." Id.

What distinguishes the cases cited by Urban from the instant case is the lack of ambiguity here as to the nature of the assembled device. In Fredman, Morningstar, and Curtis, the courts were determining whether a device utilizing commercial explosives constituted a destructive device as defined in subparagraphs (1) and (2) of S 5845(f). These cases concluded that such devices may fall within the statutory definition of a destructive device when the prosecution demonstrates the defendant's intent to use the assembled device as a weapon. By contrast, there is no doubt that the components possessed by Urban were designed to create a canister grenade -- a device clearly regulated as a destructive device under S 5845(f)(1).

A pamphlet seized at Urban's home described the process of converting an ordinary carbon dioxide ("CO2") cartridge into a fragmenting canister grenade. The pamphlet included detailed instructions and drawings on how to construct

7

such a grenade. The process involves the widening of the cartridge opening to allow the introduction of a pyrotechnic fuse and the scoring of the cartridge body to maximize fragmentation. $CO_2$ cartridges are generally designed for use in BB guns, toy racing cars, and seltzer water dispensers. The cartridges found in Urban's possession had been redesigned with serrated walls and widened openings inconsistent with a $CO_2$ cartridge's legitimate uses.

The pamphlet recommends the use of a high powered explosive in canister grenades for greater damage, rather than commercially used explosives such as black powder. One of the cartridges found in the ammunition box seized from Urban's vehicle contained TATP. The ammunition box also contained two large bags of TATP. A Government expert testified that because TATP is "so unstable" and "stores poorly," it has "never found any commercial use at all."

Section 5845(f)(3) limits its application to "any combination of parts designed or intended for use in converting any device into a constructive device as defined in subparagraphs (1) and (2)." The definition of a destructive device in subparagraph (1) includes a grenade. Here, the evidence is uncontradicted that Urban was in possession of a combination of parts expressly designed to create a canister grenade. Intent to use the components as a weapon (to assemble them into a device to be used as a weapon) is irrelevant when the parts are clearly designed to be used in constructing a device which is specifically regulated by S 5845(f)(1) or (2). We agree with the Second Circuit's construction of S 5845(f)(3) in United States v. Posnjak, 457 F.2d 1110 (2nd Cir. 1972). "When it is clear that the assembled device created by combining the components falls within (1) or (2), intent is irrelevant, for the parts are clearly `designed' to convert the device into a destructive device." Id. at 1119. We hold, therefore, that the district court did not err in ruling that it is not necessary to instruct the jury that the defendant intended to use the components as a weapon when, as here, it is undisputed that the parts were clearly designed to create a grenade.

8

III

Urban also challenges the district court's sentencing decision. He contends that the district court erred as a matter of law in concluding that a two-level enhancement pursuant to S 3B1.3 of the United States Sentencing Guidelines was justified based upon Urban's use of a special skill that significantly facilitated the commission of the crime of possession of an unregistered destructive device.[2] Urban contends that S 3B1.3 is inapplicable unless there is evidence that the defendant received special training or education. This court reviews de novo a district court's legal interpretation of the Sentencing Guidelines. United States v. Maurello, 76 F.3d 1304, 1308 (3d Cir. 1996). Because we must review the meaning of the term "special skills," and "special training and education," we will not defer to the district court in construing these words.

The district court explained the basis for its finding that Urban possessed and used a special skill in committing a violation of S 5861(d) in the following words:

> [W]e find that based on the authorities that have been cited by the probation officer[3] in his resolution, that this Defendant had sufficient sophistication to place him in a category of having a special skill.
>
> By reason of his mechanical background and training, the fact that he authored manuals specifically outlining the manner in which destructive devices could be prepared, and offered these manuals for sale as well as the Defendant's particular interest in the utilization of such devices in the event they were necessary because

_____

2. Sentencing Guideline S 3B1.3 provides in pertinent part as follows:

> If the defendant abused a position of public or private trust, or used
> a special skill in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

3. In the presentence report, the probation officer cited United States v. Spencer, 4 F.3d 115 (2d Cir. 1993) and United States v. Malgoza, 2 F.3d 1107 (11th Cir. 1993) for the proposition that "[t]hough the defendant did not receive formal training in manufacturing the explosives, several circuits have held that the `special skill' does not have to be obtained through formal education or training."

9

of some emergency that might exist even in his own
mind or those sympathetic with the Defendant's view
about this country.

Thus, the district court concluded that Urban's mechanical
background and training when considered in light of his
own research and experimentation were sufficient to
demonstrate that he possessed a special skill capable of
facilitating the commission of the crime of possessing an
unregistered destructive device.

We must determine whether the acquisition of a special
skill in the construction of a destructive device, such as a
canister grenade, can be self-taught. Urban maintains that
an enhancement is appropriate only if the evidence shows
that the defendant received "substantial education,
training, or licensing."[4] Urban correctly notes that
Sentencing Guideline S 5H1.2 recognizes that educational
and vocational skills are ordinarily not relevant in
calculating the applicable guideline range unless"a
defendant has misused special training or education to
facilitate criminal activity." United States Sentencing
Guideline S 5H1.2. He argues that S 3B1.3 should not be
applied in fixing his punishment because he never received
special training or education in the design of canister
grenades or destructive devices. No evidence was presented
that Urban received special demolition or explosives
training from the military or any source.

Urban maintains that this court's decision in United
States v. Hickman, 991 F.2d 1110 (3rd Cir. 1993) supports
his contention that he did not misuse special training or
education. We disagree.

In Hickman, a general contractor was convicted of
defrauding persons who paid him to construct a house that
was never built. Id. at 1111. The district court applied

_____

4. Application No. 2 to Sentencing GuidelineS 3B1.3 reads as follows:
"Special skills refers to a skill not possessed by members of the general
public and usually requiring substantial education, training, or
licensing. Examples would include pilots, lawyers, doctors, accountants,
chemists, and demolition experts." United States Sentencing Guidelines
S 3B1.3 (Application n. 2) (1995).

10

S 3B1.3 because it found that the defendant had used his special skill as a contractor in committing fraud. Id. at 1112-13. This court reversed because it concluded that the fact that the defendant possessed a license did not demonstrate the defendant's reliance on his training as a contractor in perpetrating the fraud. Id. at 1112-13. Unlike the historical facts presented to this court in Hickman, it is undisputed that Urban used his combined skills and self education to design and assemble the components of a canister grenade.

The record shows that Urban developed his mechanical skills through courses in industrial electronics, refrigeration, and air-conditioning at a technical school. He applied these skills as the sole owner of a business in which he engaged in plumbing, heating, refrigeration, and automotive and general repairs. In addition, Urban taught himself how to design explosive devices such as canister grenades.

During oral argument, Urban's counsel conceded that the evidence was sufficient to show that Urban was a "self-taught bomb maker." Urban's counsel argued, however, that the special skills enhancement contained in S 3B1.3 did not apply to self-taught skills. He asks that we limit the reach of S 3B1.3 to the types of skills expressly identified in Application Note 2, each of which requires "substantial education, training, or licensing." Section 3B1.3 (Application n.2) (1995). This argument ignores the use of the words "usually requiring" that precede the language "substantial education, training, or licensing." The use of the word "usually" by the Sentencing Commission demonstrates that it did not intend to preclude a trial judge from finding, on a case-by-case basis, that a defendant has obtained a special skill through life experience and self-study.

In United States v. Spencer, 4 F.3d 115 (2d Cir. 1993), the appellant argued that "he did not demonstrate any special skill in his manufacture of methamphetamine because he was a self-taught amateur." Id. at 120. In rejecting this argument, the Second Circuit reasoned as follows:

11

> A special skill is one "usually requiring substantial education, training, or licensing." See U.S.S.G. S 3B1.3, comment. (n.2) (emphasis added). Because the comment adds the word "usually," we find no basis for limiting the increase to only those with formal educations or professional skills. See United States v. Hummer, 916 F.2d 186, 191 (4th Cir. 1990) (finding that the use of the word "usually" in the note to U.S.S.G. S 3B1.3 "implies that substantial training is not a mandatory prerequisite to making a special skills adjustment"), cert. denied, 499 U.S. 970, 111 S. Ct. 1608, 113 L.Ed.2d 670 (1991). [The appellant] presents the unusual case where factors other than formal education, training, or licensing persuade us that he had special skills in the area of chemistry.

Id.

In United States v. Petersen, 98 F.3d 502 (9th Cir. 1996), the Ninth Circuit concluded that the district court did not err in determining that the defendant's computer abilities supported a special skills enhancement notwithstanding the fact that he had not had "formal training in computers." Id. at 506. In United States v. Hubbard, 929 F.2d 307 (7th Cir. 1991), the Seventh Circuit upheld the application of S 3B1.3 based on the trial court's finding that the defendant, an inventor, "had `through life's experiences obtained the special ability to tamper with consumer products.' " Id. at 191. We agree with our sister circuits that a S 3B1.3 sentence enhancement is not limited to persons who have received substantial formal education, training from experts, or who have been licensed to perform a special skill. See also United States v. Malgoza , 2 F.3d 1107, 1110-11 (11th Cir. 1993); United States v. Hummer, 916 F.2d 186, 191 (4th Cir. 1990).

The record shows that Urban used his mechanical skills, life experience, and self education to invent a method of molding the highly unstable TATP into "blocks of explosive material." Therefore, we hold that the district court did not err as a matter of law in concluding that S 3B1.3 is applicable to a person who has developed a special skill through self education and his or her work experience and uses it to facilitate the commission of a crime.

12

The judgment of conviction and sentence will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

13