

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-11-2003

# USA v. Hodge

Precedential or Non-Precedential: Precedential

Docket 01-2198

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Hodge" (2003). *2003 Decisions.* Paper 690.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/690

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed March 11, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2198

UNITED STATES OF AMERICA

v.

RICHARD "BIRD" HODGE

Richard Hodge,
Appellant

No. 01-2199

UNITED STATES OF AMERICA

v.

AKIL GREIG,

Appellant

Appeal from the District Court of the Virgin Islands
Division of St. Thomas
(D.C. Criminal Action Nos. 99-cr-00134-3/1)
District Judge: Honorable Thomas K. Moore

Argued: May 13, 2002

Before: AMBRO, FUENTES and GARTH, *Circuit Judges*

(Opinion filed: March 11, 2003)

David L. Atkinson, Esquire
United States Attorney
Kim L. Chisholm, Esquire (Argued)
Assistant U.S. Attorney
United States Courthouse
5500 Veterans Building, Suite 260
Charlotte Amalie, St. Thomas
USVI, 00802-6924

    *Attorneys for Appellee*

Richard Della Fera, Esquire (Argued)
Entin, Margules & Della Fera
110 Southeast 6th Street
Suite 1970
Fort Lauderdale, FL 33301

    *Attorney for Appellant*
    *Richard Hodge*

Stephen A. Brusch, Esquire (Argued)
International Plaza, Suite 2G
P.O. Box 988
Charlotte Amalie, St. Thomas
USVI, 00804

    *Attorney for Appellant*
    *Akil Greig*

## OPINION OF THE COURT

**AMBRO**, *Circuit Judge*:

Richard "Bird" Hodge and Akil Greig appeal their convictions on drug and firearm charges. Greig also appeals his conviction for assault on a federal officer. The primary issue in this appeal is whether the appellants possessed and distributed a "controlled substance analogue" within the meaning of 21 U.S.C. § 802(32)(A) when they sold a mixture of candle wax and flour to undercover agents under the pretense that it was crack cocaine. We hold that the wax and flour mixture is not a controlled substance analogue.

## I.  Background

On April 12, 1999, Special Agent Michael Patrick of the Bureau of Alcohol, Tobacco, and Firearms, posing as a Jamaican drug dealer and accompanied by a confidential informant ("CI"), entered the Paul M. Pearson Housing Community in St. Thomas, United States Virgin Islands. Another officer videotaped the operation from a distance and the CI wore a "wire" recording device. Patrick and the CI approached a group of individuals that included Hodge and inquired about purchasing crack cocaine. Hodge informed them that he had nothing with him, but that they should return in approximately one hour.

After Patrick and the CI left, Yambo Williams, an acquaintance of Hodge and Greig, retrieved a mixture of candle wax and flour which "looked like crack." Hodge divided the mixture into two packages. He gave one package to Greig to sell to the "Yardies"[1] — by which he meant Patrick and the CI — under the pretense that it was crack cocaine. Hodge, Greig, Williams, and Williams's father intended to defraud Patrick and the CI of $800, the price of an ounce of crack cocaine, and share the proceeds. In addition, Greig had a gun with him and announced that he planned to rob the Yardies when they returned, but Hodge told him that a gun would not be necessary.

When Patrick and the CI returned to the Pearson Housing Community at around 11 a.m., Hodge was not present, but Williams and Greig were. Greig informed them that Hodge had sent him to complete the transaction. In an alley, Patrick paid $800 for the wax/flour mixture, which he described as a "rock crystalline substance." Patrick and the CI turned to leave, but Greig called them back and asked if they would like another ounce for $600. Patrick stated that he was not interested in additional purchases. At the same time, Williams tugged on Patrick's shirt, exposing his firearm. Patrick attempted to exit the alley, but Greig then grabbed Patrick by his shirt and tried to pull him back. After a momentary scuffle, Patrick shoved free from Greig. As Patrick was walking away he heard a gun

---

1. According to the parties, "Yardies" is a term that generally refers to Jamaicans.

shot fired behind him. He turned around to see Williams, Greig, and the CI, but he could not tell who fired the gun. Williams then fled into apartment 81 of the housing community. Greig followed him into the apartment and gave him his gun. Williams escaped from the back door to the apartment and tossed the firearm onto the balcony of apartment 95. It was later recovered with five rounds of ammunition remaining in the cylinder chamber; one round had been fired.

Greig, Hodge, and Williams subsequently were arrested and indicted.[2] Williams pleaded guilty and testified for the prosecution; Hodge and Greig were tried together. A jury in the United States District Court for the Virgin Islands convicted Greig on Counts I (assault on a federal officer), II (using a firearm during a drug trafficking crime and a crime of violence), IV (conspiracy to possess with intent to distribute a controlled substance analogue), and V (possession with intent to distribute a controlled substance analogue). The jury convicted Hodge on Counts III (using a firearm during a drug trafficking crime); IV (conspiracy to possess with intent to distribute a controlled substance analogue), and V (possession with intent to distribute a controlled substance analogue). Greig was sentenced to twenty-four months imprisonment for his convictions on Counts I, IV, and V, to be served concurrently, and to ten years imprisonment for his conviction on Count II, to be served consecutively to his sentences on Counts I, IV, and

2. Count I of the indictment charged Greig with assault on a federal officer, in violation of 18 U.S.C. § 111(a)(1) & (b). Count II charged Greig with knowingly using, carrying, and discharging a firearm in the course of crimes relating to drug trafficking and a crime of violence (assault on a federal officer), in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Count III charged Hodge with knowingly using, carrying, and discharging a firearm in the course of crimes relating to drug trafficking, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2. Count IV charged Greig, Hodge and Williams with conspiracy to possess with intent to distribute a controlled substance analogue, in violation of 21 U.S.C. § 846. Count V charged Greig, Hodge, and Williams with possession with intent to distribute a controlled substance analogue, in violation of 21 U.S.C. §§ 802(32)(A)(iii), 813, 841(a)(1) and 18 U.S.C. § (2). Count VI charged Williams with being an accessory after the fact to the crime of assault on a federal officer, in violation of 18 U.S.C. § 3.

V. Hodge was sentenced to twenty-one months imprisonment for his convictions on Counts IV and V, to be served concurrently, and to ten years imprisonment for his conviction on Count III, to be served consecutively to his sentences on Count IV and V. Both defendants filed motions for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 and for a new trial pursuant to Fed. R. Crim. P. 33. The District Court denied both motions, *United States v. Greig*, 144 F. Supp. 2d 386 (D.V.I. 2001), and these timely appeals followed.[3]

## II. Discussion

### A. *Controlled Substance Analogue*

#### 1. *Background*

A "controlled substance analogue," which is defined more precisely below, is "substantially similar" to a controlled substance but not specifically prohibited under the federal drug laws. 21 U.S.C. § 802(32)(A). The Controlled Substance Analogue Enforcement Act of 1986 (the "Analogue Act") provides that "[a] controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I." 21 U.S.C. § 813. The object of the Analogue Act is to prevent underground chemists from producing slightly modified drugs that are legal but have the same effects and dangers as scheduled controlled substances. Examples of controlled substance analogues include gamma-butyrolactone, an analogue of GHB (more commonly called the "date-rape drug"), and 1-(3-oxy-3 phenyl-propyl)-4 phenyl-4-propionoxypiperidine, which is a synthetic form of heroin. *See United States v. Fisher*, 289 F.3d 1329 (11th Cir. 2002); *United States v. Ono*, 918 F.2d 1462 (9th Cir. 1990). At issue in this case is whether the mixture of candle wax and flour that appellants sold to Patrick and the CI is a controlled substance analogue.

The statutory definition of the term "controlled substance analogue" states:

_____

3. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

[With certain exceptions not relevant here,] the term "controlled substance analogue" means a substance —

(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A).

The Government, focusing on the word "or" between subparts (ii) and (iii), proposes a disjunctive interpretation for § 802(32)(A), namely that a substance is a controlled substance analogue if it satisfies any one of clauses (i), (ii), or (iii). If so, the mixture of candle wax and flour that Hodge and Greig sold appears to be a controlled substance analogue under subpart (iii). Hodge and Greig "represent[ed]" their product to be crack cocaine and, therefore, to have a "stimulant . . . effect on the central nervous system" "substantially similar" to a "controlled substance in schedule I or II." Appellants, on the other hand, read § 802(32)(A) conjunctively. They argue that a controlled substance analogue must satisfy both clause (i) and either clause (ii) or (iii). A candle wax and flour mixture is not "substantially similar" in chemical structure to crack cocaine as required under clause (i). Accordingly, under appellants' reading, it cannot be a controlled substance analogue regardless whether they represented it to be crack cocaine.

The District Court in this case read the definition disjunctively, but every other federal court to consider the

issue has read it conjunctively. We exercise plenary review over the District Court's interpretation of a statute and, more generally, its legal conclusions. *See In re CM Holdings, Inc.*, 301 F.3d 96, 101 n.3 (3d Cir. 2002). This is a matter of first impression in our Court. Moreover, no federal court of appeals has considered the issue in any depth. *See McKinney v. United* States, 221 F.3d 1343 (Table) (8th Cir. 2000) (paraphrasing the test in the conjunctive without discussion); *United States v. Granberry*, 916 F.2d 1008, 1010 (5th Cir. 1990) (stating the test in the disjunctive without discussion); *see also Fisher*, 289 F.3d at 1338 (expressly declining to decide the issue). A more thorough treatment is found in a number of district court opinions.

In *United States v. Forbes*, 806 F. Supp. 232 (D. Col. 1992), the District Court for the District of Colorado held that the text of § 802(32)(A) either plainly supports the conjunctive reading or is otherwise "[a]t best . . . ambiguous." *Id.* at 235. It reasoned that the "operative segments of clauses (ii) and (iii) both begin with the word 'which,' signaling the start of a dependent relative clause modifying a precedent noun." *Id.* Moreover, because "[m]odifying phrases generally refer to immediately preceding phrase[s]," the "precedent noun is 'chemical structure' in clause (i)." *Id.* The Court also thoroughly reviewed the Analogue Act's legislative history. It determined that the House bill that ultimately served as the basis for the Act undeniably intended the conjunctive reading. "The analogue statute," it found, "is directed at underground chemists who tinker with the molecular structure of controlled substances to create new drugs that are not scheduled. If a substance could be an analogue without a substantially similar chemical structure, Congress' stated purpose would be significantly expanded." *Id.* at 236. Further, a disjunctive reading would produce "unintended or absurd results," the avoidance of which is a "deeply rooted rule of statutory construction." *Id.* at 235. For example, alcohol or caffeine would be controlled substance analogues. Likewise, in an observation particularly pertinent to this case, "powdered sugar would be an analogue if a defendant represented that it was cocaine, effectively converting this law into a counterfeit drug statute." *Id.* As evidence that this was not Congress's

purpose, a House report on the Analogue Act emphasized that it required a substantial similarity in chemical structure to avoid accidentally criminalizing innocuous substances, such as coffee. *Id.* at 235-36 (citing H.R. Rep. No. 948, 99th Cong., 2d Sess. 4, 7 (1986)).

The District Court for the Southern District of New York reached a similar conclusion in *United States v. Roberts,* 2001 WL 1646732 (S.D.N.Y. Dec. 17, 2001). It found *Forbes's* grammatical analysis persuasive. *Id.* at *3. Moreover, undertaking its own review of the legislative history, it concluded that "[c]learly, the targets of the statute were not pushers of counterfeit drugs that bear no chemical similarity to scheduled narcotics, but ill-intentioned manufacturers and distributors of drugs that, when altered in their chemical structure, resembled those that had already been scheduled." *Id.* at *5.

In *United States v. Clifford,* 197 F. Supp. 2d 516 (E.D. Va. 2002), the District Court for the Eastern District of Virginia addressed a factual scenario similar to the one in our case. Three men participated in a fraudulent scheme to market an over-the-counter combination of ginseng and vitamin B as the schedule I drug MDMA, commonly known as "ecstasy." *Id.* at 517. Vacating their convictions, the District Court made a compelling case for the conjunctive reading. As always, it began with the plain meaning of § 802(32)(A). It rejected the assumption that there is a "universally recognized or authoritatively stated rule" that "a series of subordinate clauses must be read in the disjunctive if the penultimate and final clauses are separated by 'or.'" *Id.* at 519. In fact, Congress itself followed a different convention in another part of § 802, in which it "listed a number of subordinate clauses in a fashion similar to Section 802(32)(A), but placed the term 'or' after every subsection to denote a clear disjunctive intent." *Id.* at 519-20 (citing 21 U.S.C. § 802(9)). Turning to the legislative history, the Court found "not a scintilla of evidence" that "Congress intended to cover and criminalize sales of legal substances such as flour, salt, ginseng, vitamin B, etc., merely because the seller represents they will yield a stimulant, depressant, or hallucinogenic effect like that of a controlled substance." *Id.* at 520-21. Instead,

it agreed with *Forbes* that the focus of the law was to criminalize the work of underground chemists. Ultimately, the *Clifford* Court concluded that "after considering the statute's language, structure, and purpose, it is clear that Congress intended Section 802(32)(A) to be read conjunctively." *Id.* at 522.

Next, the District Court for the Northern District of Georgia in *United States v. Vickery*, 199 F. Supp. 2d 1363 (N.D. Ga. 2002), followed the reasoning in *Clifford*, *Forbes*, and *Roberts* in most relevant respects. It also added further insights on the Analogue Act's legislative history, such as the observation that the Senate's version of the bill did not permit liability for merely a "represented or intended effect." *Id.* at 1369.

Finally, *United States v. Klecker*, 228 F. Supp. 2d 720, 727 (E.D. Va. 2002), noted briefly that "[a]ll of the cases that have interpreted the Analogue Act, with one exception" — the District Court in *Greig* — "have held it should be interpreted in the conjunctive," and opted to do so in that case as well.

Parting company with the above decisions, the District Court in this case determined that § 802(32)(A) must be read disjunctively. *Greig*, 144 F. Supp. 2d at 386. It first asserted that as "a general rule of statutory construction, an 'or' placed before the last term in a series indicates that each term in the series is intended to be read in the disjunctive and given separate meaning." *Id.* at 389 (citing *United States v. Urban*, 140 F.3d 229, 331 (3d Cir. 1998)). It then reasoned that

> [t]he structure of section 802(32)(A) and the plain meaning of its language compel the conclusion that this is an ordinary disjunctive series. In all three clauses, a dependent relative clause modifying a precedent noun is signaled by the relative pronoun "which." In each case, the precedent noun is "a substance," which is found in the main clause.

*Id.*

Turning to the legislative history, the District Court found that neither the House nor the Senate intended to require

proof by the Government of both a chemical structure substantially similar to that of a controlled substance *and* a substantially similar effect. The House version of the bill initially included the word "and" after clause (i) and its three prongs were structured differently so that what is now clause (i) was more obviously a requirement in every case; however, these indications of a conjunctive meaning were deleted from the final version without explanation.[4] Likewise, the Senate's version of the bill required the Government to prove either that the alleged controlled substance analogue possessed a chemical structure "substantially similar to the chemical structure of a controlled substance" *or* was "specifically designed to produce an effect substantially similar to, or greater than, the effect of a controlled substance," but not both. *Id.* at 393 (quoting 132 Cong. Rec. 30322, 30329 (1986)) (emphasis added by the District Court). "Since there is no 'clearly expressed legislative intention to the contrary,'" the District Court noted that it "must follow the Supreme Court's directive and regard the plain language of section 802(32)(A) as conclusive." *Id.* at 393-94 (quoting *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)). The District Court then determined what it considered the plain meaning of the statute to be, and held that "a substance may be a controlled substance analogue if it satisfies

---

4. *Id.* at 390. The initial House version stated:

   [T]he term 'controlled substance analogue' means a substance —

   (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; *and*

   (ii)(I) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system; *or*

   (II) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system substantially similar to [that] of a controlled substance.

*Id.* at 390 (citing H.R. Rep. No. 99-848, pt. 1, at 1 (1986)) (emphasis added by the District Court). While the change from this version of the bill may seem incongruous with a conjunctive reading, for the reasons we discuss below in the text, we do not consider it a persuasive indication of Congressional intent.

subsection (i), (ii), or (iii) of 21 U.S.C. § 802(32)(A).” *Id.* at 394.

We reject the District Court’s disjunctive reading and adopt instead the conjunctive reading endorsed in *Forbes, Roberts, Clifford, Vickery,* and *Klecker.* Our reasoning is similar to that of these district courts. In short, we conclude that the plain meaning of § 802(32)(A) is ambiguous and that the legislative history indisputably favors the conjunctive reading.

2. *Plain Meaning*

We begin, of course, with the plain meaning of a statute. *See Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 907, 909 (3d Cir. 1990) (“[T]he starting point for interpreting a statute is the language of the statute itself.”) (internal citation omitted). We have said that “canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meaning unless the context dictates otherwise.” *United States v. 6109 Grubb Rd.*, 886 F.2d 618, 626 (3d Cir. 1989) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)). Indeed, we have also said that “[w]hether requirements in a statute are to be treated as disjunctive or conjunctive does not always turn on whether the word ‘or’ is used; rather it turns on context.” *United States v. One 1973 Rolls Royce*, 43 F.3d 794, 815 (3d Cir. 1994).

This proposition — that “or” between two words indicates that each can stand alone — decides the ordinary case. But is this the “ordinary” case, *i.e.*, does “the context dictate otherwise”? Here, even within § 802, Congress did not always consider a single “or” between the final terms of a series sufficient evidence of disjunctive intent. As noted in *Clifford*, the definition of “depressant or stimulant substance” in § 802(9) contains an “or” after each clause. 197 F. Supp. 2d at 519-20. Accordingly, where “or” is absent between clauses (i) and (ii) but present between (ii) and (iii), we do not find conclusive evidence for a disjunctive reading.

Indeed, in the context of the Analogue Act, we think that the definition of a controlled substance analogue reads more naturally in the conjunctive. First, clause (i) seems to

state an independent requirement; even the dictionary defines chemical analogues in terms of their similar chemical structures.[5] *See* American Heritage Dictionary 65-66 (3d ed. 1992) (defining "analogue" in chemistry as "[a] structural derivative of a parent compound that often differs from it by a single element"). At the same time, clauses (ii) and (iii) read in parallel and appear subordinate to clause (i) because the functional language in each begins with the relative pronoun "which." The doctrine of the last antecedent teaches that "qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding" and not to "others more remote." *See Resolution Trust Corp. v. Nernberg*, 3 F.3d 62, 65 (3d Cir. 1993) (quoting *Azure v. Morton*, 514 F.2d 897, 900 (9th Cir. 1975)). That suggests that clauses (ii) and (iii) more likely modify clause (i)'s phrase "controlled substance in schedule I or II" than the word "substance" in the main clause. *See also* 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.33 (6th ed. 2000).

Notwithstanding this analysis, we readily concede that the disjunctive reading is plausible. The word "or" between clauses (ii) and (iii) does not *prove* that all three clauses of § 802(32)(A) are disjunctive, only that many people would read it that way. With two possible readings, we conclude that § 802(32)(A) is ambiguous as to whether it should be read conjunctively or disjunctively.

3. *Legislative History*

When the language of a statute is ambiguous, we look to its legislative history to deduce its purpose. *See Gerbier v. Holmes*, 280 F.3d 297, 309 (3d Cir. 2002); *United States v. Pollen*, 978 F.2d 78, 85 (3d Cir. 1992). It is particularly important to confine ambiguous criminal statutes to their intended scope. *See Dowling v. United States*, 473 U.S. 207, 213 (1985) ("[W]hen assessing the reach of a federal criminal statute, we must pay close heed to language,

5. We recognize, however, that arguments from dictionary definitions can only take us so far when construing a provision that is itself definitional. Absent an absurd departure from conventional English, Congress of course is free to define terms in statutes differently than any particular dictionary does.

legislative history, and purpose in order strictly to determine the scope of the conduct the enactment forbids. Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a 'narrow interpretation' appropriate."). Moreover, we will not read a statute to produce absurd or unintended results "demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982); *accord United States v. Zats*, 298 F.3d 182, 187 (3d Cir. 2002).

The Analogue Act's purpose is to make illegal the production of designer drugs and other chemical variants of listed controlled substances that otherwise would escape the reach of the drug laws. This was the goal — the only goal — announced by legislators during debate on the House and Senate versions of the bill that became the Analogue Act. *See, e.g.*, 131 Cong. Rec. 19114 (1985) (statement of Sen. Thurmond) ("This proposal will prevent underground chemists from producing dangerous designer drugs by slightly changing the chemical composition of existing illegal drugs."); 131 Cong. Rec. 27311 (1985) (statement of Sen. D'Amato) (stating that the Analogue Act "closes the loophole in present law that allows the creation and distribution of deadly new drugs without violating Federal law"); 131 Cong. Rec. 32950 (1985) (statement of Rep. Lungren) ("The focus of this proposal is clearly to impact on the designer drug phenomena by making it illegal for the clandestine chemists to manufacture and distribute these substances."). Congress was concerned about chemicals that have been altered by "adding a fluoride or an extra carbon molecule" from their scheduled counterparts, 131 Cong. Rec. 27311 (1985) (statement of Sen. D'Amato), not about mundane compounds such as candle wax and flour. *See* 131 Cong. Rec. 32950 (1985) (statement of Rep. Lungren) (explaining that "this proposal is not intended to cover alcoholic beverages, tobacco products, aspirin, or other legitimate consumer products").

The District Court emphasized that while the House's original version of § 802(32)(A) unambiguously was phrased conjunctively and the Senate's version was phrased disjunctively, the final version was "an amalgam of the

House and Senate versions" that "effectively transformed the House's original two prongs into three prongs, deleted the House's conjunctive 'and,' included the Senate's 'substantially similar' language in subpart (ii), and retained the disjunctive 'or' between subparts (ii) and (iii)." *Greig*, 144 F. Supp. 2d at 393. The District Court took from this that the House abandoned its conjunctive approach.

We disagree. What the District Court overlooks is that neither the original House nor Senate version evidenced any intent to extend the drug laws to substances, like wax and flour, that bear no similarity to scheduled controlled substances. The House version, as already described, required both a similar chemical structure to a controlled substance and a similar effect. *Id.* at 390. The Senate version required either a similar chemical structure or that the substance was "specifically designed" to produce the effect of a controlled substance. *Id.* at 393. Thus, while the Senate version was disjunctive in one sense, both prongs of its test plainly referred to attempts to create *actual* chemical substitutes for scheduled controlled substances. Neither the Senate version nor the House version had anything to do with criminalizing the sale of non-drugs labeled as scheduled controlled substances. Accordingly, whether the final draft of § 802(32)(A) was an "amalgam" of the House and Senate version does not affect our conclusion. Two competing versions of the same law, neither of which would impose liability separately, do not result in liability when put together.[6]

Further, we fundamentally disagree with the District Court's implicit presumption that § 802(32)(A) criminalizes the appellants' conduct absent a clear legislative intent to the contrary. *See id.* at 394 ("Importantly, there is nothing in the legislative history of the [Analogue Act] to hint that Congress did not intend to provide for prosecution of

---

6. Incidentally, the change in the name of the bill from "Designer Drug Enforcement Act of 1986" to "Controlled Substance Analogue Enforcement Act" was not, as the District Court suggests, intended to reflect an expanded "purpose and scope" for the Act after its inception. *Id.* at 393 n.5. Rather, Senator D'Amato explained that the "title is being changed because of concern that the phrase 'designer drugs' is too appealing a name for these killers." 131 Cong. Rec. 27311 (1985).

persons as illegal drug traffickers who falsely represent that a substance has the same effect as a schedule I substance."). It is improper to infer criminal liability from a statute's failure to say what is permitted. The burden is the inverse. *See Dowling*, 473 U.S. at 214 ("[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.") (citations omitted).

One argument for the Government's disjunctive reading is that the House of Representatives apparently modified an earlier version of the Analogue Act that contained the word "and" between clauses (i) and (ii) and in which clauses (ii) and (iii) were combined into a single prong. *See supra* note 4 (quoting the earlier House version). Arguably this modification represented an "intentional step away from the conjunctive approach." *Vickery*, 199 F. Supp. 2d at 1368. However, we are not persuaded that this unexplained change was intentional. It would be passing strange for Congress unexpectedly to have expanded without comment the definition of controlled substance analogues to include non-drugs at the last minute. *See Clifford*, 197 F. Supp. 2d at 522 ("Such a radical alteration would surely have occasioned some comment or remark from Congress. The silence in this regard speaks loudly in favor of inadvertence as the explanation for the change."). Moreover, another House version of the same bill inadvertently omitted not only the two-prong structure and the word "and," but also the word "or" after clause (ii). *Greig*, 144 F. Supp. 2d at 390 n.2 (quoting 132 Cong. Rec. 32717, 32732 (1986)). If that version were our focus, one could argue that only substances satisfying clauses (i), (ii), *and* (iii) are controlled substance analogues, a reading with which we assume the Government would disagree vehemently. We hesitate to read too much into unexplained, minor structural or stylistic changes in legislation. If one looks hard enough, there may be typographical errors in the sundry drafts of a statute to suit many possible interpretations.

We conclude that Congress did not intend to include innocuous substances such as wax and flour within its

definition of controlled substance analogues. Moreover, even if we were not sure, we would be compelled to reverse the appellants' drug convictions. *See Government of Virgin Islands v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993) (counseling that "any ambiguity concerning the meaning of a criminal statute be resolved in favor of the criminal defendant"). We find prophetic a related discussion — cited in *Clifford* and *Vickery* — by the Fourth Circuit in *United States v. Sampson*, 140 F.3d 585 (4th Cir. 1998). *Sampson* held that "flex" — a mixture of flour, wax, and baking soda fraudulently sold as cocaine — was not a "counterfeit substance" within the meaning of 21 U.S.C. § 802(7). *Id.* at 589-90. In language equally applicable to our case, the Fourth Circuit remarked that

> [s]elling flex does not constitute a crime punishable by any known federal law. Simply because a substance looks like cocaine, and the defendant misrepresents to his unsuspecting purchaser that the substance is cocaine, does not make the mere distribution of that substance a violation of the federal narcotics laws.

*Id.* at 589.

We share the *Sampson* Court's common sense skepticism of the District Court's outcome. The treatment of candle wax and flour, no matter how it is marketed, as a schedule I controlled substance is an "absurd" result of the kind our canons of construction instruct us to avoid. *See Zats*, 298 F.3d at 187. Accordingly, we reverse Hodge's and Greig's drug convictions on Counts IV and V.

## B. Assault on a Federal Officer

Greig challenges the sufficiency of the evidence supporting his conviction for assault on a federal officer pursuant to 18 U.S.C. § 111(a)(1) & (b). Our review of the sufficiency of the evidence after a guilty verdict is "highly deferential." *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001).

> [W]hen deciding whether a jury verdict rests on legally sufficient evidence it is not for us to weigh the evidence or to determine the credibility of the witnesses. Rather, we must view the evidence in the light most favorable

> to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002) (citation omitted).

The Government introduced evidence that Greig obtained a gun after Patrick and the CI left the Pearson Housing Community on the morning of April 12, 1999, and that, according to Williams, Greig announced his intention to rob them. Later, when Patrick refused to purchase a second ounce of "crack" and attempted to leave the alley where the transaction occurred, Greig pulled him back. Greig also struggled with Patrick until he shoved Greig away and turned to escape. Someone — Patrick did not see which individual — then fired a gun. Patrick perceived that the gun had been fired at him. He turned around and saw Greig and the CI with Williams close by. Greig then fled into an apartment where he handed a gun to Williams. When authorities retrieved the gun from the balcony of another apartment, they found that it had been fired.

We hold that a rational jury could have concluded from this evidence that Greig, while using a deadly weapon, assaulted a federal officer.[7] Accordingly, we affirm his conviction pursuant to 18 U.S.C. § 111(a)(1) & (b).

### C. Possession of a Firearm

Hodge and Greig both challenge their convictions for possession of a firearm during and in relation to a drug trafficking crime or a crime of violence pursuant to 18 U.S.C. § 924(c)(1)(A)(iii). We immediately resolve Hodge's challenge in his favor because we have reversed his underlying drug conviction, and he was not convicted of a crime of violence. Greig was convicted of a crime of violence — assault on a federal officer using a deadly weapon — so his challenge does not automatically succeed.

---

7. To the contrary, Greig contends that there was not enough evidence for a rational jury to so conclude. He argues that, *inter alia*, Agent Patrick testified to not seeing Greig with a gun and to not being certain that a gun was even fired at him. We are not persuaded by Greig's arguments.

Greig argues that the question whether he discharged a deadly weapon, for which § 924(c)(1)(A)(iii) prescribes a mandatory ten-year minimum sentence, should have been submitted to the jury. He cites *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), which established that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[8]

Greig's argument is foreclosed by the Supreme Court's recent decision in *Harris v. United States*, 122 S.Ct. 2406 (2002). It focused on § 924(c)(1)(A)(ii), a parallel provision to § 924(c)(1)(A)(iii). Clause (ii) provides a seven-year minimum penalty for brandishing a gun, while clause (iii) provides a ten-year minimum for discharging one. The Court held that "brandishing" in clause (ii) and "discharging" in clause (iii) are "sentencing factors to be found by the judge, not offense elements to be found by the jury." *Id.* at 2414. Because these sentencing factors increase the minimum penalty, not the statutory maximum, *Apprendi* does not apply. Accordingly, the District Court need not have instructed the jury to find beyond a reasonable doubt that Greig "discharged" a firearm within the meaning of § 924(c)(1)(A)(iii).

## D. Juror Misconduct

Greig contends that he is entitled to a new trial on the ground of juror misconduct.[9] The District Court denied the motion in a published opinion. *United States v. Greig*, 133 F. Supp. 2d 697 (D.V.I. 2001). We review the District Court's response to allegations of juror misconduct for abuse of discretion, *United States v. Bertoli*, 40 F.3d 1384, 1392 (3d Cir. 1994), and we affirm.

The misconduct alleged is that juror Chastity Caines

---

8. The Government argues that Greig did not raise this issue in the District Court and therefore our review is for plain error. *See United States v. Vasquez*, 271 F.3d 93, 96 (3d Cir. 2001). Our outcome, however, is the same regardless of the standard of review.

9. Hodge initially joined in Greig's motion for a new trial in the District Court, but he does not press the issue of juror misconduct on appeal.

intentionally did not disclose at *voir dire* that she knew Greig, and that she improperly revealed extraneous information about Greig to the other jurors. Greig introduced an affidavit by Marlene Francis, sister of alternate juror Millicent Francis, stating that Millicent told Marlene that a juror serving with her knew Greig and that he was often in trouble. The District Court granted Greig's motion for an evidentiary hearing to investigate these allegations.

The District Court first interviewed Millicent Francis and then heard testimony from Chastity Caines. Francis stated that Caines told the jurors that Greig had a bad reputation and that he once stabbed a person. Caines confessed that she knew Greig from an adult education class, but explained that she did not believe that she knew him personally. She denied discussing his reputation or background with the other jurors. Coincidentally, the hearing revealed that Francis herself also knew Greig but did not say so at *voir dire* because she, too, believed that she did not know him personally. After interviewing eleven of the twelve jurors and all three alternate jurors, the District Court determined that only one juror remembered hearing anything at trial about Greig purportedly stabbing someone. Moreover, the trial transcript revealed that Williams mentioned that stabbing when he testified.

To receive a new trial because of errors during *voir dire*, Greig "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip. Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *accord United States v. Richards*, 241 F.3d 335, 344 (3d Cir. 2001). Generally, we will not invalidate a jury verdict because of a juror's "mistaken, though honest" response at *voir dire*. *McDonough Power*, 464 U.S. at 555. The standard with regard to extraneous information is that "[a] new trial is warranted if the defendant likely suffered 'substantial prejudice' as a result of the jury's exposure to the extraneous information." *United States v. Lloyd*, 269 F.3d 228, 238 (3d Cir. 2001) (citing *United States v. Gilsenan*, 949 F.2d 90, 95 (3d Cir.1991)).

The failure of Caines to disclose her familiarity with Greig was apparently "mistaken, though honest," and did not materially affect the fairness of the trial. *See McDonough Power*, 464 U.S. at 555. Moreover, the jurors overwhelmingly denied that Caines disclosed any prejudicial, extraneous information about Greig. In this context, the District Court did not abuse its discretion in refusing to grant Greig a new trial.

\* \* \* \* \* \* \*

The District Court erred in characterizing the wax and flour mixture sold by the appellants as a controlled substance analogue. Accordingly, we reverse both appellants' convictions for conspiracy to possess with intent to distribute a controlled substance analogue (Count IV) and possession with intent to distribute a controlled substance analogue (Count V). As a result, we reverse Hodge's conviction for possession of a firearm during and in relation to a drug trafficking crime (Count III) and remand for an entry of judgment of acquittal.

We affirm Greig's conviction for assault on a federal officer (Count I) and his conviction for possession of a firearm during and in relation to, *inter alia*, a crime of violence (Count II), but we remand for resentencing on both counts.[10] We also affirm the District Court's denial of

10. First, as to Greig's conviction on Count I (assault on a federal officer), the adjusted offense level was 15. His convictions on Counts IV (conspiracy to possess with intent to distribute a controlled substance analogue) and V (possession with intent to distribute a controlled substance analogue) increased his offense level by 2 points to 17. The Presentence Investigation Report indicates that Greig was to be sentenced under Criminal History Category I. Accordingly, the guideline range for a 15 point offense is 18-24 months and for a 17 point offense it is 24-30 months. Because we have voided Greig's convictions on Counts IV and V, it would appear that the resulting total offense level for his conviction on Count I falls within a different sentencing range.

Second, as to Greig's firearm conviction (Count II), 18 U.S.C. § 924(c)(1)(A)(iii) provides for a minimum sentence of ten years imprisonment if the firearm is discharged "during and in relation to any crime of violence *or* drug trafficking crime . . . ." (emphasis added). Greig initially was convicted and sentenced for crimes of both violence and drug trafficking. We have voided his conviction for the latter, but we are not in a position to determine whether this affects Greig's sentence. Although it may not, we remand to have his sentence on Count II considered for the particular crime for which Greig is being sentenced.

Greig's motion for a new trial on the ground of juror misconduct.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*